UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

MARY A. MILLER,                    )
                                   )
                Plaintiff,         )
                                   )
        v.                         )    No.  1:08CV62 SNLJ
                                   )               (FRB)
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
                Defendant.         )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

        This cause is before the Court on plaintiff's appeal of
an adverse ruling by the Social Security Administration.  All
pretrial matters were referred to the undersigned United States
Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate
disposition.

**I.  Procedural Background**

        On September 22, 2005, plaintiff Mary A. Miller filed an
application for Disability Insurance Benefits (Tr. 73-77) and an
application for Supplemental Security Income (Tr. 321-24) pursuant
to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401
et seq., §§ 1381 et seq.  In her applications for benefits,
plaintiff claimed that she became disabled and unable to work
because of her disabling condition on June 26, 2005.  On initial
consideration, the Social Security Administration denied
plaintiff's claims for benefits.  (Tr. 38-42, 315-19, 320.)  Upon
plaintiff's request, a hearing was held before an administrative

law judge (ALJ) on August 2, 2007.  Plaintiff testified at the hearing and was represented by counsel.  (Tr. 326-62.)  On October 25, 2007, the ALJ issued a decision denying plaintiff's claims for benefits, specifically finding that plaintiff could perform her past relevant work.  (Tr. 9-17.)  On February 28, 2008, the Appeals Council denied plaintiff's request for review of the ALJ's adverse decision.  (Tr. 2-4.)  The ALJ's determination is thus the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

At the hearing on August 2, 2007, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was fifty-two years of age.  (Tr. 330.)  Plaintiff stands five-feet, six inches tall and weighs in excess of 200 pounds.  Plaintiff is right-handed.  (Tr. 331.)  Plaintiff is married, but separated from her husband.  Plaintiff lives alone in a mobile home for which plaintiff's step-daughter provides money for rent.  (Tr. 330-31, 332.)  Plaintiff completed the eleventh grade in high school.  Plaintiff did not obtain a GED.  (Tr. 331.)  Plaintiff receives food stamps and has a medical card.  (Tr. 333.)

From the 1970's to 2005, plaintiff worked as a waitress and cashier in restaurants.  From 2000 to 2005, plaintiff worked as a cashier/attendant at a gas station.  (Tr. 128.)  Plaintiff also worked for one day at a Citgo station in July 2005.  (Tr. 112.)  Plaintiff testified that she last worked at the Town and Country

Bakery Deli from December 2006 to April 2007. Plaintiff testified that she worked only three days a week. (Tr. 334-36.) Plaintiff testified that, subsequent to her applications for benefits, she also worked at the Huddle House for a period of approximately two and one-half years. Plaintiff testified that her job at the Huddle House ended with a change in ownership and a resulting loss of hours. Plaintiff testified that she could not afford to drive to and from work for the hours she was scheduled. Plaintiff testified that she received unemployment benefits upon the termination of this employment. (Tr. 336.)

Plaintiff testified that problems with her back, legs and hands prevent her from working. (Tr. 340.) Plaintiff testified that she could no longer perform work as a cashier because she cannot stand for an eight-hour shift, and that she would have to sit for breaks. (Tr. 337.) Plaintiff testified that while washing dishes, she must sit before she is finished because of problems with her back. (Tr. 340.) Plaintiff testified that she attended physical therapy on two occasions for her back but discontinued the therapy because she could not afford it. (Tr. 340-41.) Plaintiff testified that she was told she had a deteriorating disc and arthritis in her back, and that she should not lift anything in excess of five pounds. (Tr. 342, 347.)

Plaintiff testified that she has cellulitis in her left leg, and that she experiences pain radiating from the right side of her back to her left leg. Plaintiff testified that she also had

pain caused by bone spurs in her heel for which she received cortisone injections. (Tr. 343-44.)

Plaintiff testified that she has carpal tunnel syndrome in her hands and that the tingling of her hands wakes her at night. (Tr. 338, 344.) Plaintiff testified that she could not perform work because her hands go to sleep. (Tr. 337-38.) Plaintiff testified that she experiences pain in her palms and that the fingers on her left hand are sore. Plaintiff testified that she drops things and must stop certain activities, such as ironing, due to the tingling in her hands. (Tr. 346.) Plaintiff testified that she has not pursued relief for her condition because she is concerned that she may lose medical coverage for such treatment. "I'm afraid to start procedures and then not be able to have the surgery or have what I need done to my hands." (Tr. 338.) Plaintiff testified that she did not pursue relief while she had coverage because her heart condition and high blood pressure were of primary concern. (Tr. 344.) Plaintiff also testified that she does not like to go to doctors because she always went to them when she was a child. (Tr. 338.)

Plaintiff testified that she takes medication for high blood pressure, but that her condition has been under control since she stopped working because she was no longer under any stress. (Tr. 345.)

Plaintiff testified that she experiences no side effects from her medication, but that she has no energy anymore. (Tr.

353.)

Plaintiff testified that she can lift a gallon of milk but must put it down right away. (Tr. 349.) Plaintiff testified that she was sometimes required to lift in excess of five pounds at work but had difficulty because of her back. (Tr. 348-49.) Plaintiff testified that she could probably stock a shelf, but that she would have to do it slowly. Plaintiff testified that she would make herself carry a case of soda or beer if she had to do it in her employment, but that she would experience pain afterward. Plaintiff testified that she can walk for one block or for one-half of a block before she experiences pain in her right hip and low back. (Tr. 349.) Plaintiff testified that she has difficulty standing to dust furniture, to wash dishes, or to walk through the grocery store because of the pressure in her back. Plaintiff testified that she can stand for approximately five minutes before having to sit down due to her back problems. (Tr. 349-50, 353.) Plaintiff testified that she can sit for ten minutes before her feet begin to swell. Plaintiff testified that she cannot get up from a squatting position. (Tr. 350-51.)

As to daily activities, plaintiff testified that she does her own shopping and her own housekeeping but that she performs such tasks slowly. Plaintiff testified that she has her groceries packed in many bags so she does not have to carry much weight. Plaintiff testified that she has no social life, does not attend church, and does not go anywhere. (Tr. 351.) Plaintiff testified

that she drives, and drove approximately fifty miles to the hearing site that day but stopped on two occasions along the way. (Tr. 354.) Plaintiff testified that she is responsible for checking to make sure that three horses on her rented property have enough water. (Tr. 333, 360.)

### III. Medical Records

On October 21, 2002, plaintiff underwent cardiac catheterization, angiography, and ventriculogram for evaluation of arteriosclerotic heart disease, angina, dyspnea, hypertension, positive treadmill, and occipital headaches with occasional vertigo. (Tr. 192-95.) Non-critical coronary artery disease (CAD) was diagnosed as a result of these studies, which Dr. Donald J. Voelker of the Cardiovascular Institute determined to be considerable for someone of plaintiff's age. (Tr. 193-94.) Plaintiff was instructed as to diet, exercise and weight loss. An ultrasound of plaintiff's thyroid showed a thyroid nodule. (Tr. 193.)

Plaintiff underwent a thyroid sonogram on February 14, 2003, which showed a prominent lobulated thyroid gland with heterogeneous echogenicity, most likely representing Hashimoto's thyroiditis. (Tr. 304.)

In notes dated February 14, February 15 and March 26, 2004, FNP Ellen Howell of Plunkett Family Care Center wrote that plaintiff was "off work." No reason was given for these work excuses. (Tr. 289.)

On March 2, 2004, plaintiff visited Dr. L.J. Plunkett, Jr., with complaints of burning and tingling in both hands, with the right hand being worse than the left. It was noted that plaintiff experienced problems at work in that she engaged in a lot of writing and also cleaned trays. Plaintiff was referred for evaluation of possible carpal tunnel syndrome. (Tr. 265.)

Plaintiff returned to Dr. Plunkett on March 26, 2004, with complaints relating to sinusitis and incontinence. (Tr. 264.)

Plaintiff visited Dr. Plunkett on June 25, 2004, and reported that a horse had stepped on her right foot two months prior and that she was currently experiencing a pulling and burning sensation. Physical examination showed tenderness and swelling about the right lateral aspect of the foot. Plaintiff experienced increased pain with dorsiflexion. Plaintiff was diagnosed with tendinitis of the right foot. Medication was prescribed, including Toprol XL.[1] Samples of Mobic[2] were also given. (Tr. 263.)

Plaintiff visited Dr. Plunkett on September 1, 2004, and reported that she fell at work two days prior and was currently experiencing pain in the middle back and left heel. Plaintiff reported that it hurt to breathe. (Tr. 261.) X-rays of the chest and thoracic spine taken that same date were negative. (Tr. 261, 284.) Plaintiff was diagnosed with back pain and was prescribed

---

[1]Toprol XL is indicated for the treatment of hypertension and angina pectoris. Physicians' Desk Reference 606 (55th ed. 2001).

[2]Mobic is indicated for relief of the signs and symptoms of osteoarthritis. Physicians' Desk Reference 981 (55th ed. 2001).

Darvocet.[3]  (Tr. 261.)  Plaintiff returned to Dr. Plunkett on October 14, 2004, for an unrelated matter, but continued to complain of back pain.  (Tr. 260.)

On January 19, 2005, plaintiff visited Dr. Plunkett and requested that she be prescribed different blood pressure medication that her insurance carrier would cover.  Plaintiff was prescribed Captopril, Atenolol,[4] Levothyroxine,[5] and Darvocet.  (Tr. 259.)

Plaintiff visited the emergency room at Poplar Bluff Regional Medical Center on January 24, 2005, complaining of right shoulder pain, with the onset of such pain occurring at work the previous day.  (Tr. 239-48.)  Plaintiff also complained that her hand tingles and swells when she writes.  (Tr. 245.)  An x-ray taken of the shoulder that same date showed no acute fracture or dislocation.  (Tr. 247, 283.)  Plaintiff was given Toradol.[6]  (Tr. 242.)  Upon discharge that same date, plaintiff was diagnosed with a ligamentous sprain of the right shoulder and was instructed not

[3]Darvocet is indicated for the relief of mild to moderate pain.  Physicians' Desk Reference 1708-09 (55th ed. 2001).

[4]Atenolol and Captopril are indicated for the treatment of hypertension.  Physicians' Desk Reference 647, 2118 (55th ed. 2001).

[5]Synthroid (Levothyroxine) is used as replacement therapy in patients with hypothyroidism.  Physicians' Desk Reference 1641 (55th ed. 2001).

[6]Toradol is indicated for the short-term management of moderately severe acute pain that requires analgesia at the opioid level.  Physicians' Desk Reference 2789-91 (55th ed. 2001).

to lift more than five pounds for the next four to five days. Plaintiff was also instructed to keep her fingers and wrists moving. (Tr. 247.)

Plaintiff returned to the emergency room at Poplar Bluff Regional Medical Center on January 31, 2005, and complained of pain in her back and upper left leg. Plaintiff reported the pain to have recently begun and that such pain was exacerbated by walking. (Tr. 229-38.) Plaintiff reported her pain to be at a level ten on a scale of one-to-ten. (Tr. 230.) Range of motion was noted to be normal. (Tr. 235.) Plaintiff's current medications were noted to be Captopril, Atenolol, Darvocet, and Lomotil.[7] (Tr. 230.) Plaintiff was given Demerol[8] and Catapres.[9] (Tr. 231.) Plaintiff was discharged that same date and reported no pain upon discharge. (Tr. 234.) Plaintiff was prescribed Flexeril[10] and Vicodin[11] upon discharge. (Tr. 236.)

Plaintiff visited Dr. Plunkett on February 1, 2005, and

_____

[7]Lomotil is effective as adjunctive therapy in the management of diarrhea. Physicians' Desk Reference 3008 (55th ed. 2001).

[8]Demerol is indicated for the relief of moderate to severe pain. Physicians' Desk Reference 2851 (55th ed. 2001).

[9]Catapres is indicated in the treatment of hypertension. Physicians' Desk Reference 967 (55th ed. 2001).

[10]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 1929 (55th ed. 2001).

[11]Vicodin is indicated for the relief of moderate to moderately severe pain. Physicians' Desk Reference 1629-30 (55th ed. 2001).

complained of experiencing back pain the previous day with muscle spasms in her back radiating down her leg. Plaintiff currently complained of no back pain. Redness was noted about the left leg with warmth to the touch. It was noted that plaintiff was off of work that week. Plaintiff was diagnosed with cellulitis and was prescribed Keflex, an antibiotic. Plaintiff was instructed to take Motrin or Tylenol and to rest. (Tr. 258.)

Plaintiff returned to Dr. Plunkett on February 2, 2005, and complained of worsening redness, swelling and pain in her left leg. Plaintiff was administered an injection of Depo-Medrol[12] as well as an injection for tetanus. Plaintiff was instructed to continue on her current medications. (Tr. 257.) On February 3, 2005, Dr. Plunkett noted the condition to have improved. (Tr. 256.) In a note dated February 7, 2005, APRN Becky Cannaday of Plunkett Family Care Center wrote that plaintiff "may return to work." (Tr. 281.)

Plaintiff returned to Dr. Plunkett on February 15, 2005, and complained of pain in her left foot and leg. Plaintiff reported her left leg to feel as though it weighed over 100 pounds. Plaintiff's ankles were noted to be swollen. Plaintiff was diagnosed with leg pain and was administered an injection of Depo-Medrol. Plaintiff's Keflex was refilled. (Tr. 255.)

Plaintiff returned to Dr. Plunkett on February 21, 2005,

---

[12]Depo-Medrol is a corticosteroid injected to relieve inflammation. Medline Plus (last reviewed Sept. 1, 2008) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601157.html>.

and complained of pain in her right low back radiating to her left leg. Dr. Plunkett noted plaintiff's cellulitis to have improved. (Tr. 254.) An MRI was ordered of plaintiff's lower back, and plaintiff was instructed to reduce her work week to four days. (Tr. 254, 282.)

On March 2, 2005, an MRI was taken of plaintiff's spine in response to plaintiff's complaints of experiencing low back pain and left leg pain for six months. The MRI showed moderate disc space narrowing and disc degeneration at L5-S1. Evidence of end plate degeneration at L5 was also noted. There was no evidence of disc herniation or spinal canal stenosis. (Tr. 279.)

Plaintiff returned to Dr. Plunkett on March 7, 2005. Plaintiff reported that she sometimes had no trouble with her back and at other times had trouble getting out of bed. Plaintiff expressed concern regarding the occasional shooting pain to her leg. The results of the MRI were discussed, and plaintiff was diagnosed with low back pain. It was noted that plaintiff refused physical therapy. Plaintiff was instructed to engage in back exercises, and Tylenol was suggested. (Tr. 253.)

On March 10, 2005, Dr. Plunkett prescribed physical therapy in which plaintiff was to participate three times per week for four weeks. The purpose of the therapy was for low back strengthening and to decrease pain. (Tr. 277.) Plaintiff appeared at Ozark Therapy on March 23, 2005, who noted plaintiff to complain of low back pain, decreased abdominal strength, tightness of

hamstrings and right quadratus lumborum, decreased lumbar range of motion, and decreased function. Plaintiff reported that she experienced severe pain at the end of a work day. Therapy benefits were identified and goals were set. (Tr. 275.)

Plaintiff went to the emergency room at Poplar Bluff Regional Medical Center on May 25, 2005, with complaints of leg pain. (Tr. 220-28.) Plaintiff reported having had right back pain which radiated to the left leg, and that her lower left leg was currently red, swollen and painful. (Tr. 225.) Plaintiff reported her pain to be at a level nine. (Tr. 227.) Rocephin, an antibiotic, was administered. (Tr. 226.) Plaintiff was discharged that same date in stable condition. Plaintiff was diagnosed with cellulitis and chronic back pain upon discharge, and was prescribed Lortab[13] and Augmentin, an antibiotic. (Tr. 228.)

Plaintiff was admitted to the emergency room at Barnes-Jewish Hospital on May 26, 2005, complaining of experiencing redness and swelling of the left leg for two days. (Tr. 291-93.) Plaintiff reported that she went to a hospital emergency room for the condition and was given a prescription for antibiotics, but did not fill the prescription because she could not afford the medication. Plaintiff denied any dizziness, muscle weakness or abnormal sensations. Dopplar examination showed no deep vein thrombosis. Plaintiff reported a history of hypertension for which

---

[13]Lortab is indicated for the relief of moderate to moderately severe pain. <u>Physicians' Desk Reference</u> 3209-10 (55th ed. 2001).

she takes Atenolol and Captopril; CAD for which she underwent left catheterization two years prior; urge incontinence due to urethral stenosis; hypothyroidism; and previous antibiotic treatment for cellulitis. (Tr. 291.) It was noted that plaintiff also took Lasix.[14] It was noted that plaintiff worked as a waitress. Physical examination showed 1+ ankle edema on the right leg and 2+ ankle edema on the left leg. The left leg was noted to be swollen with areas of redness from the dorsum of the foot spreading toward the thigh. (Tr. 292.) Plaintiff was diagnosed with cellulitis and was given Clindamycin.[15] Plaintiff was also diagnosed with hypertension for which she was continued on Atenolol and Captopril; and hypothyroidism for which she was started on Synthroid. (Tr. 292-93.) Plaintiff was discharged that same date with instruction to engage in activity as tolerated. (Tr. 295.)

On August 11, 2005, plaintiff visited Dr. Plunkett and reported feeling fatigued and achy. Dr. Plunkett noted plaintiff to have been out of medication for about a month. Dr. Plunkett instructed that plaintiff's medications, including Lasix, Atenolol, Captoprol and Levothyroxine, be refilled. Plaintiff was diagnosed with hypertension, edema and hypothyroidism. (Tr. 250.)

---

[14]Lasix is used to reduce the swelling and fluid retention caused by various medical problems, including heart disease. It is also used to treat high blood pressure. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html>.

[15]Clindamycin is indicated in the treatment of serious infections caused by susceptible anaerobic bacteria. Physicians' Desk Reference 2583 (55th ed. 2001).

X-rays taken of the lumbar spine on November 1, 2005, showed degenerative disc changes at L2-3 and L5-S1. Modest straightening of normal lumbar alignment was also noted. (Tr. 218.)

On November 22, 2005, plaintiff underwent a consultative examination for disability determinations. (Tr. 211-17.) Dr. Chul Kim noted plaintiff's complaints to include hypertension, thyroid problem, and multiple joint pain. Plaintiff reported her hypertension to be under control when she takes her medication, but that beginning four months prior she could no longer afford the medication. Plaintiff reported that a cardiac catheterization performed at Poplar Bluff Regional Medical Center two or three years prior showed a mild degree of blockage in multiple coronary arteries. Plaintiff also reported that she had experienced thyroid problems since she was nineteen years of age but that, beginning four months prior, she could no longer afford the medication. (Tr. 211.) With respect to her back condition, plaintiff reported that she fell fifteen years prior and developed low back pain, with x-rays showing a deteriorating disc. Plaintiff reported the pain to begin radiating to her leg in May 2005. Plaintiff reported that she was prescribed physical therapy but could not afford it, and that it was not recommended that she have surgery. Plaintiff reported that she currently experienced low back pain if she stood on her feet to do something or lied down for a long period of time. Plaintiff also reported that she occasionally experiences pain and

swelling in her knees with such condition beginning in the 1990's when, on one occasion, her knees gave out and she fell. Plaintiff reported the swelling in her left leg to have resolved since having been treated in May 2005 for cellulitis. Plaintiff reported her feet to swell when she is on her feet for a long period of time. Plaintiff also reported that she has carpal tunnel syndrome in her right hand with related tingling when she drives. Plaintiff reported that she obtained benefit with medication but that she had not had surgery for the condition. As to her exertional abilities, plaintiff reported that she could stand for fifteen minutes, walk for fifty feet, lift up to fifty pounds, sit for up to one hour, and drive a vehicle for up to three hours. (Tr. 212.)

Dr. Kim's physical examination showed no significant limitation in range of motion of any major joint. Plaintiff was able to straight leg raise up to ninety degrees bilaterally with complaints of a pulling sensation in the lower back. (Tr. 214, 216-17.) Plaintiff's gait was noted to be stable. Plaintiff was able to bear full weight on her right and left leg, get on and off of the examination table, walk on heels and toes, and squat without significant problem. No edema was present in the legs. Deep tendon reflexes on both knees and ankles were decreased to a moderate degree. Hand grip and fine finger movements were normal. (Tr. 214.) Upon conclusion of the examination, Dr. Kim diagnosed plaintiff with hypertension, intermittent exertional chest pain, hypothyroidism, multiple joint pain with probable degenerative

joint disease, and obesity.  (Tr. 214-15.)

On December 7, 2005, plaintiff underwent a bronchospasm evaluation at the direction of disability determinations, the results of which showed a mild degree of restrictive lung disease. (Tr. 199-210.)

Plaintiff visited the Bloomfield Medical Clinic (Bloomfield) on September 7, 2006.  It was noted that plaintiff was concerned about her elevated blood pressure despite her prescribed medications.  Plaintiff also complained of pain under her right arm, fatigue, and of ear pressure and ringing.  Physical examination was unremarkable.  (Tr. 163.)

On September 27, 2006, plaintiff returned to Bloomfield and reported experiencing extreme fatigue.  Plaintiff also reported that she felt shaky inside, but that she can resolve this feeling with a candy bar.  Physical examination was unremarkable.  (Tr. 161.)

Plaintiff returned to Bloomfield on November 9, 2006, and requested that she be prescribed Aciphex.[16]  It was also noted that plaintiff had suffered chronic diarrhea for twenty years with incontinence.  Plaintiff also reported that her heel hurt again and that injections had helped this condition in the past.  (Tr. 162.)

On January 3, 2007, plaintiff visited Bloomfield and complained of cold symptoms.  Plaintiff also reported having

_____

[16]Aciphex is indicated for short-term treatment in the healing and symptomatic relief of gastroesophageal reflux disease. Physicians' Desk Reference 1178-79 (55th ed. 2001).

experienced urinary stress incontinence for several years and that she often had accidents.  (Tr. 158.)

Plaintiff returned to Bloomfield on January 11, 2007, and reported her cold symptoms to have improved.  Plaintiff currently complained that she was again having trouble with a heel spur in her left foot.  (Tr. 157.)  Plaintiff was referred to Dr. Zwackrie Parr, a podiatrist.  (Tr. 156.)

On January 22, 2007, plaintiff visited Dr. Parr for complaints of left heel pain interfering with her ability to walk. Plaintiff reported having intermittent problems with her feet for about two years, but that the condition had progressively worsened over the previous few months.  Plaintiff reported that she was given a cortisone injection two weeks prior which did not resolve the pain.  Dr. Parr noted swelling and inflammation about the heel with apparent bursitis.  Plaintiff had good range of motion.  It was noted that plaintiff stands on her feet for long hours during the day.  Dr. Parr noted there to be no sign of tarsal tunnel syndrome, deep vein thrombosis, or phlebitis.  Plaintiff currently denied any history of low back pain or sciatica.  Dr. Parr noted plaintiff's medications to include Norvasc[17] and Lasix.  Upon examination of x-rays, Dr. Parr diagnosed plaintiff with retrocalcaneal bursitis with inflammation, and plantar inferior

---

[17]Norvasc is indicated for the treatment of hypertension. Physicians' Desk Reference 2506 (55th ed. 2001).

calcaneal spur bilateral. Plaintiff was placed on Medrol Dosepak[18] to reduce acute inflammation. A steroid injection of Celestone/Xylocaine was administered to the bursa of the left heel. Plaintiff was instructed to continue with normal activity. (Tr. 189.)

Plaintiff returned to Dr. Parr on February 5, 2007, and reported that the left heel was doing much better. Plaintiff reported experiencing discomfort upon initial weight bearing with some pain periodically throughout the day, "but nothing bad." Some inflammation, swelling and bursitis was noted. Dr. Parr diagnosed plaintiff with left heel spur syndrome. Plaintiff was instructed to continue with stretching exercises and was placed on Naproxen.[19] Another injection of Celestone/Xylocaine was administered to the left plantar bursa. (Tr. 190.)

On February 19, 2007, plaintiff reported to Dr. Parr that she was experiencing pain and discomfort in her left leg. Plaintiff reported having been treated for cellulitis in the past. Dr. Parr noted plaintiff's left heel to be much better and that plaintiff experienced only mild discomfort periodically throughout

---

[18]Medrol relieves inflammation (swelling, heat, redness, and pain), and is used to treat certain forms of arthritis as well as skin and thyroid disorders. Medline Plus (last revised Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682795.html>.

[19]Naproxen is indicated for the treatment of rheumatoid arthritis, osteoarthritis, ankylosing spondylitis, and for the management of pain. Physicians' Desk Reference 2744-45 (55th ed. 2001).

the day.  Upon examination, Dr. Parr diagnosed plaintiff with possible cellulitis with pain in the left leg, for which an antibiotic, Omnicef, was provided.  Dr. Parr also continued in his diagnosis of left heel spur syndrome, for which another injection of Celestone/Xylocaine was administered.  Plaintiff was instructed to continue with stretching exercises.  (Tr. 190.)

On March 5, 2007, plaintiff visited Dr. Parr and complained of throbbing pain in her left heel causing problems with walking.  Dr. Parr diagnosed plaintiff with retrocalcaneal bursitis, and determined to order an MRI due to plaintiff's lack of response to conservative treatment.  Plaintiff was instructed to continue with her stretching exercises, and an injection of Celestone/Xylocaine was administered to the left retrocalcaneal bursa.  (Tr. 188.)

An MRI taken of plaintiff's left ankle on March 9, 2007, showed thickening of the Achilles tendon probably due to tendinosis and partial tear.  Edema in the soft tissues adjacent to the Achilles tendon was noted, as well as about the distal calf and the ankle region.  A cortical cyst involving the distal tibia was noted.  Mild degenerative arthritis was also noted, as well as spur about the posterior and plantar aspect of the calcaneus.  (Tr. 186.)

On March 14, 2007, plaintiff visited Bloomfield and complained of pain in her right hip and left heel.  Plaintiff reported the lumbar pain to have developed over the past few weeks

and that rest resolved the pain. Plaintiff reported the pain to flare up with working. It was noted that plaintiff worked in a deli/bakery which required walking and lifting. It was also noted that Dr. Parr was managing plaintiff's heel pain. (Tr. 154.) APRN Regina Lewis of Bloomfield prescribed Ultracet[20] and Medrol Dosepak for plaintiff. (Tr. 155.)

An x-ray taken of plaintiff's lumbar spine on March 15, 2007, showed some degenerative disc disease and some mild osteoarthritic lipping. (Tr. 182.)

On March 19, 2007, plaintiff reported to Dr. Parr that the left foot was doing much better but continued to be slightly sore. Dr. Parr noted plaintiff to be on Medrol Dosepak for sciatica and questioned whether the heel improvement was due to such therapeutic intervention. Another injection of Celestone/ Xylocaine was administered. (Tr. 188.)

Plaintiff returned to Bloomfield on March 21, 2007, and reported her right hip to feel as though it "catches," but that it felt fifty-percent better. It was noted that plaintiff was able to work two days, but that her hip bothered her because she had to drive a lot. (Tr. 153.)

Plaintiff returned to Dr. Parr on April 16, 2007, and reported her left heel to be tender and sore, "but not bad." Dr.

---

[20]Ultracet is an opiate agonist used to relieve moderate to moderately severe pain. <u>Medline Plus</u> (last reviewed Sept. 1, 2008)<<u>http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/</u> a695011.html>.

Parr noted plaintiff to currently have some retrocalcaneal tendinitis with minimal bursitis. Plaintiff was instructed to continue with Naproxen. (Tr. 187.)

On April 24, 2007, plaintiff reported to Bloomfield that she had experienced urinary urgency all her life but experienced no leakage. Plaintiff requested a follow-up regarding her CAD. (Tr. 152.) Upon referral for CAD follow-up, APRN Lewis noted plaintiff's medications to include Captopril, Atenolol, K-Dur (potassium), Lasix, Norvasc, Aciphex, and Vytorin.[21] APRN Lewis also noted plaintiff to be currently unemployed, and that she had been working at Wal-Mart but was unable to tolerate the work because of foot problems. (Tr. 149-50.)

Plaintiff visited the Cardiovascular Institute on May 7, 2007, for follow-up of her cholesterol and other testing, the results of which were all within normal limits. Plaintiff was instructed to continue with her current medical regimen and to follow up in six months. (Tr. 197.)

On May 14, 2007, plaintiff returned to Dr. Parr and reported her left foot not to be bothering her as much. Dr. Parr noted plaintiff to be ambulating well and to be ninety-nine percent inflammation-free. Plaintiff was encouraged to continue with stretching exercises and to discontinue Naproxen. Plaintiff was

_____

[21]Vytorin is used to reduce the amount of cholesterol and other fatty substances in the blood. Medline Plus (last revised May 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603015.html>.

instructed to resume normal activity. (Tr. 187.)

Plaintiff visited Bloomfield on May 18, 2007, and reported that she had been fired from her job. It was noted that plaintiff stated "something about missing boxes from freezer." Plaintiff reported that she was claiming a civil action and requested that a form be completed for Missouri Human Rights. (Tr. 147.) In a Medical Information Form completed that same date for the Missouri Commission on Human Rights, APRN Lewis wrote that plaintiff was limited to three work days a week due to degenerative joint disease. APRN Lewis noted that plaintiff experienced pain with persistent standing, walking and lifting; and that a change of position was required frequently. APRN Lewis opined that plaintiff's degenerative joint disease was a permanent condition. (Tr. 148.)

Plaintiff visited Bloomfield on June 20, 2007, and reported feeling weak and sweaty a few days prior. Plaintiff reported that she felt better when she ate. (Tr. 146.)

Plaintiff returned to the Cardiovascular Institute on July 3, 2007, and complained of an episode whereby she became sweaty and dizzy with walking. Plaintiff denied any exertional chest pain but reported feeling tired. Physical examination was unremarkable. (Tr. 198.) An adenosine/cardiolite test performed that same date showed a small area of mild anteroapical ischemia, warranting further evaluation. (Tr. 196.)

Plaintiff returned to Bloomfield on August 3, 2007, and

complained of low back pain. It was noted that the pain was not radiating. Plaintiff reported that Ultracet was not helping. It was noted that plaintiff had a hearing the previous day during which she sat all day. Physical examination was unremarkable. (Tr. 145.)

## IV.  The ALJ's Decision

The ALJ found that plaintiff was insured for a Period of Disability and Disability Insurance Benefits on June 26, 2005, and continued to remain insured throughout the date of the decision. The ALJ found that the plaintiff had not engaged in substantial gainful activity since June 26, 2005. The ALJ found that plaintiff had been more than minimally limited by degenerative disc disease but that plaintiff's condition did not meet or medically equal an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. The ALJ further found plaintiff's allegations not to be fully credible. The ALJ found that, since June 26, 2005, plaintiff had the residual functional capacity to lift or carry twenty pounds occasionally and ten pounds frequently; to sit six hours in an eight-hour day; and to stand or walk a total of six hours in an eight-hour day. The ALJ found plaintiff not to have any postural, manipulative or environmental limitations. The ALJ found plaintiff able to perform her past relevant work as a waitress or cashier. The ALJ thus found plaintiff not to be under a disability since June 26, 2005. (Tr. 16-17.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or

combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." <u>Id.</u> (internal

quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a

- 26 -

contrary outcome.  <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole.  Specifically, plaintiff contends that the ALJ erred by requiring objective medical evidence of plaintiff's pain and thus erred in his adverse credibility determination.  In addition, plaintiff argues that the ALJ failed to evaluate the combined effect of all of her impairments.  The undersigned will address plaintiff's contentions in turn.

A.  <u>Credibility Determination</u>

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted).  Although the ALJ may discount subjective complaints of pain if there are inconsistencies in the evidence as a whole, he may not do so solely because the complaints are not fully supported by the objective medical evidence.  <u>Goff v. Barnhart</u>, 421 F.3d 785, 792 (8th Cir. 2005); <u>Halpin v. Shalala</u>, 999 F.2d 342, 346 (8th Cir. 1993).  Strict reliance on the absence of

objective medical evidence is reversible error. Halpin, 999 F.2d at 346.

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Masterson v. Barnhart, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. Id. at 738; see also Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005); Pearsall, 274 F.3d at 1218.

Plaintiff complains here that the ALJ committed reversible error by requiring objective medical evidence to substantiate plaintiff's subjective complaints of pain and thus erred in his adverse credibility determination. A review of the ALJ's written decision, however, belies plaintiff's contention.

As noted by the plaintiff, the ALJ considered the

objective medical evidence of record and determined it not to support plaintiff's complaints. Specifically, the ALJ noted that an MRI taken of the lumbar spine in early 2005 showed there to be a moderate degree of disc space narrowing, but no herniation or stenosis. The ALJ also noted that x-rays taken in November 2005 and March 2007 showed only mild degenerative changes of the lumbar spine. The ALJ noted that Dr. Kim's physical examination of plaintiff in November 2005 showed no significant deficits, and that medical records from plaintiff's visits to Bloomfield Medical Clinic in 2006 and 2007 showed no musculoskeletal or neurological deficits or abnormalities. See Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002)(ALJ may consider contrary medical evidence in determining credibility of plaintiff's subjective complaints); see also Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (in determining claimant's credibility, ALJ properly considered that the signs of chronic and severe musculoskeletal pain were not present). Contrary to plaintiff's assertion, however, and as demonstrated below, the ALJ did not improperly focus only on the lack of objective evidence of pain in determining to discredit plaintiff's subjective complaints.

In addition to the lack of objective medical evidence of pain, the ALJ identified the Polaski factors in his decision and set out numerous inconsistencies in the record to support his conclusion that plaintiff's complaints were not credible. Specifically, the ALJ noted plaintiff's daily activities from

December 2006 to April 2007 included part-time work as a deli worker, and that such activity was inconsistent with plaintiff's testimony that she could stand for only five minutes at a time and was unable to walk more than one block at a time. See Goff, 421 F.3d at 792 ("Working generally demonstrates an ability to perform a substantial gainful activity."); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001) (working at a job while applying for benefits is an activity inconsistent with complaints of disabling pain); Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (same); Starr v. Sullivan, 981 F.2d 1006, 1008 n.3 (8th Cir. 1992) (claimant's work activity considered in ALJ's credibility findings determinative of claimant's capacity to work during relevant period). Although plaintiff argues that this employment should be considered an "unsuccessful work attempt," the undersigned notes that the ALJ did not find such work to constitute substantial gainful activity which would, in itself, disqualify plaintiff from the receipt of disability benefits. (Tr. 13.) See Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). Instead, the ALJ considered plaintiff's work activity only in relation to plaintiff's credibility, and found such activity to be inconsistent with plaintiff's allegations of disabling symptoms. (Tr. 15.) This is especially significant here inasmuch as, as noted by the ALJ, plaintiff's employment was terminated for reasons other than her impairment. See Goff, 421 F.3d at 793 (significant to credibility determination when a claimant leaves work for reasons

- 30 -

other than impairment); cf. Andler, 100 F.3d at 1392 (a work effort can be considered an unsuccessful work attempt when the claimant must quit due to an impairment or due to the removal of special impairment-related conditions which were essential to her performance of such work). The ALJ also noted that plaintiff's allegations regarding her limited exertional abilities were inconsistent with her statements to treating and/or examining sources that she could drive up to three hours at a time, sit up to an hour at a time, lift up to fifty pounds, and stand for long periods of time for purposes of work. See Gray v. Apfel, 192 F.3d 799, 804 (8th Cir. 1999) (inconsistent statements regarding level of pain casts doubt upon claimant's credibility). As a further inconsistency in the record, the ALJ noted that plaintiff obtained unemployment benefits after the alleged onset date of disability and continued to receive them until December 2005. See Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994) (statement required for unemployment benefits that claimant is capable of working and seeking work is "clearly inconsistent" with claim of disability during same period). Finally, the ALJ noted that only conservative treatment had been prescribed for plaintiff's impairments. See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (while claimant may experience pain, lack of surgery and reliance on conservative treatment inconsistent with disabling pain). Substantial evidence on the record as a whole supports these findings.

While the ALJ considered the objective medical evidence

as a factor in his adverse credibility determination, such consideration was permissible here inasmuch as the ALJ also considered many other inconsistencies in the record in determining plaintiff's subjective complaints not to be fully credible. See Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006); Ramirez, 292 F.3d at 581. A review of the ALJ's decision shows him to have thoroughly reviewed all of the evidence and discussed in detail why plaintiff's subjective complaints of disabling pain were inconsistent and thus not fully credible. Relying in part on the medical evidence to support his credibility determination was not error. Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (lack of objective medical evidence is one factor ALJ may consider); see also Olund v. Chater, 62 F.3d 1421 (8th Cir. 1995) (table).

A review of the ALJ's decision shows that, in a manner consistent with and as required by Polaski, the ALJ considered plaintiff's subjective complaints on the basis of the entire record before him and set out numerous inconsistencies detracting from plaintiff's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, this Court must defer to the ALJ's credibility determination. Goff, 421 F.3d at 793; Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005); Gulliams v. Barnhart, 393 F.3d 798, 801

(8th Cir. 2005).

B.   <u>Combined Effect of Impairments</u>

Plaintiff contends that the ALJ failed to consider the combined effect of all of her impairments.   Plaintiff does not indicate, however, which of her impairments were not considered by the ALJ.

It is well established that the failure to consider the combined effects of physical and mental impairments "violates the Social Security Act and constitutes reversible error."   <u>Pratt v. Sullivan</u>, 956 F.2d 830, 835 (8th Cir. 1992).   Where an ALJ separately discusses the claimant's impairments and complaints of pain, as well as her level of activity, it cannot be reasonably said that the ALJ failed to consider the claimant's impairments in combination.   <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992).   This is precisely what the ALJ did here.

The ALJ separately discussed plaintiff's degenerative disc disease and determined such impairment to be severe.   The ALJ then went on to note that the medical record was devoid of objective medical evidence to support plaintiff's allegations of carpal tunnel syndrome, impaired knees and impaired hip.   As such, the ALJ determined these conditions not to be medically determinable impairments.   20 C.F.R. §§ 404.1508, 416.908 (to be considered as a basis for disability, a physical impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of

symptoms."). The ALJ also discussed plaintiff's hypertension, hypothyroidism and heel spurs and found them not to be severe, noting specifically that such conditions were controlled through medical treatment and did not impose significant work-related limitations. The ALJ likewise determined plaintiff's CAD not to be severe inasmuch as testing performed in 2002 showed the condition to be non-critical, plaintiff's treatment notes from September 2006 through August 2007 consistently showed normal results, and plaintiff reported in April 2007 that she did not have any cardiac symptoms. In conjunction with his discussion of plaintiff's multiple alleged impairments, the ALJ discussed plaintiff's complaints of pain and the evidence of record relating to such complaints. The ALJ also discussed the level of plaintiff's daily activities and the extent to which the record supported plaintiff's claims of limitations caused by her impairments.

In light of the ALJ's separate discussion of each of plaintiff's impairments, her level of activity, and her complaints of pain, the ALJ sufficiently considered the combined effects of plaintiff's impairments. Browning, 958 F.2d at 821; Smith v. Chater, 959 F. Supp. 1142, 1147-48 (W.D. Mo. 1997). "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." Browning, 958 F.2d at 821.

## VI. Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination is supported by

substantial evidence on the record as a whole and plaintiff's claims of error should be denied. Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may exist in the record that would have supported a contrary outcome or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001); <u>Browning</u>, 958 F.2d at 821. Accordingly, the decision of the Commissioner denying plaintiff's claims for benefits should be affirmed.

Therefore,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that plaintiff's Complaint be dismissed with prejudice.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **August 24, 2009.** Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


_Frederick R. Buckles_
_____
UNITED STATES MAGISTRATE JUDGE


Dated this _12th_ day of August, 2009.